UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| KRISTEN H., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-307-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Kristen J. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act, and her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 10).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 5, 6. Plaintiff also filed a reply brief. *See* ECF No. 7. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 5) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 6) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed applications for DIB and SSI on July 10, 2018, alleging disability beginning April 15, 2015 (the disability onset date), due to: "(1) anxiety; (2) memory loss; (3) post-traumatic stress disorder; (4) depression; (5) seizures; (6) fainting spells; and (7) migraine headaches." Transcript ("Tr.") 169-75, 176-81, 196. The claims were denied initially on

November 23, 2018, after which Plaintiff requested a hearing. Tr. 15. On January 16, 2020, Administrative Law Judge Bryce Baird ("the ALJ") conducted hearing in Buffalo, New York. Tr. 15. Plaintiff appeared and testified at the hearing and was represented by Carol A. Brent, an attorney. *Id*. Michael Smith, an impartial vocational expert, also appeared and testified by telephone. *Id*.

The ALJ issued an unfavorable decision on February 27, 2020, finding that Plaintiff was not disabled. Tr. 12-33. On January 5, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's February 27, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

2

work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his February 27, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2. The claimant has not engaged in substantial gainful activity since April 15, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: anxiety disorder, depressive disorder and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[1] except the claimant can lift and carry 20 pounds occasionally and ten pounds frequently; the claimant can sit, stand or walk up to six hours in an eight hour workday; the claimant can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds, occasional balancing, stooping, kneeling or crouching but never crawling; the claimant can frequently handle and finger bilaterally; the claimant can never be exposed to hazards such as unprotected eights or moving machinery; the claimant is limited to simple, routine tasks that can be learned after a short demonstration or within 30 days; the claimant can perform work allowing a person to be off task 5 % of the workday, in addition to regularly scheduled break; the claimant can perform work that does not require travel to unfamiliar places; the claimant can perform work that does not require teamwork, such as on a production line; and the claimant can perform work that requires doing the same tasks every day with little variation in location, hours, or tasks.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 23, 1992 and was 22 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

---

[1]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15-29.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on July 10, 2018, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 29. The ALJ also determined that based on the application for supplemental security income protectively filed on July 10, 2018, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id*.

## **<u>ANALYSIS</u>**

Plaintiff asserts a single point of error. Plaintiff argues that the ALJ erred because he did not tether the medical evidence to the 5% off-task time limitation included in the RFC, and instead, "crafted a highly specific RFC" based on his "lay opinion of Plaintiff's complex psychiatric impairments." *See* ECF No. 5-1 at 1, 13-25. Accordingly, argues Plaintiff, the limitations in the RFC were not supported by substantial evidence. *See id*.

In response, the Commissioner argues that substantial evidence supports the RFC limitation that Plaintiff would be off task 5% of the workday. *See* ECF No. 6-1 at 5-12. The Commissioner further argues that Plaintiff, not the Commissioner, bears the burden of showing that he is unable to perform the RFC, which she has failed to do. *See id*.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ thoroughly analyzed the record evidence, including the medical opinion evidence, the treatment records and other objective evidence, and Plaintiff's activities of daily living, and substantial evidence, supports the ALJ's finding that Plaintiff would be "off task 5% of the workday, in addition to regularly scheduled break[s]." Accordingly, the Court finds no error.

The record reflects that Plaintiff received psychiatric treatment from Brylin Behavioral Health Center (Tr. 574-680, 693-716, 1005-08), Horizon Health Services Center (Tr. 964-1003), and Suburban Psychiatric Associates (Tr. 341-54, 740-67), for depression and anxiety, and PTSD related to a sexual assault.

On April 15, 2015, Plaintiff was seen by nurse practitioner Jeanne Salada-Conroy, APRN-BC ("Ms. Salada-Conroy"), at Suburban Psychiatric Associates ("Suburban Psychiatric"), for anxiety and medication follow up. Tr. 341. Ms. Salada-Conroy noted that Plaintiff had "a long history of anxiety" with gradual onset that became chronic. *Id*. Plaintiff reported daily symptoms that were moderate in severity and aggravated by lack of sleep and stress. *Id*. She reported that she was taking her medication as prescribed, which helped alleviate her symptoms. *Id*. On psychiatric examination, Ms. Salada-Conroy noted that Plaintiff appeared to be in "mild/moderate" distress with slowed motor activity and anxious affect. Tr. 342. Plaintiff was alert and oriented with intact memory, fair attention span and concentration, intact judgment and insight, and adequate impulse

control. *Id*. Ms. Salada-Conroy diagnosed "generalized anxiety disorder, depressive disorder NOS [not otherwise specified]." *Id*.

On April 19, 2015, Plaintiff was treated in the Emergency Department ("ED") at Suburban Hospital for abdominal pain and rectal bleeding following a sexual assault that had occurred three days prior. Tr. 296-302. Plaintiff reported that the incident happened when she went to a co-worker's home and was "greeted by two unknown men." Tr. 296. She believed she was drugged because she had trouble remembering what happened after "she was given 3 to 4 mixed drinks." Tr. 296. Plaintiff again sought treatment on April 30, 2015, for continued pelvic and back pain since the assault. Tr. 302-11. She was assessed with pelvic pain likely secondary to the recent sexual assault and exacerbated by an ovarian cyst. Tr. 307.

Plaintiff saw Ms. Salada-Conroy on May 6, 2015, complaining of pain, memory issues, flinching, nightmares, and high anxiety after she had been raped the prior week. Tr. 344. On examination, Plaintiff displayed anxiety and exhibited "mild/moderate distress" with an anxious mood and affect. Tr. 345. Plaintiff was diagnosed with generalized anxiety, depressive disorder, and post-traumatic stress disorder. *Id*. On June 16, 2015, Plaintiff told Ms. Salada-Conroy that she was having a 'hard time" and "passed out with panic attacks." Tr. 347. She reported that she had just started taking Prozac and did not like BuSpar. *Id*. She also reported taking a friend's Concerta, which helped her focus. *Id*. Ms. Salada-Conroy noted similar clinical findings to previous visits. Tr. 348.

On August 20, 2015, Plaintiff reported trazadone was not working and stated she was "doing better." Tr. 353. She reported she was starting school for her M.S. degree in social work. *Id*. Plaintiff reported "drinking with friends when socializing, and may have up to 4 drinks if she is out for several hours." *Id*. Ms. Salada-Conroy advised Plaintiff not to fill her trazadone. Tr. 354. She also counseled Plaintiff about medication compliance and not using alcohol or drugs. Tr. 355.

On September 16, 2015, Plaintiff reported she had "high anxiety." Tr. 356. Ms. Salada-Conroy noted similar clinical findings to previous visits. Tr. 357.

On October 7, 2015, Plaintiff reported to Ms. Salada-Conroy that she was "stressed" and had "high anxiety" because "Buffalo news reporters are still after her," and "she has been in and out of court for hockey player rape trial." Tr. 362. Clinical findings were essentially unchanged. Tr 363. On December 3, 2015, Plaintiff reported she was doing better but still had daily symptoms which were aggravated by sleep and stress issue. Tr. 369. She displayed anxiety during her session and was in moderate/severe distress. Tr. 371. Ms. Salada-Conroy provided a note excusing Plaintiff from some of her courses because "[t]he content of the coarses [*sic*] cause[d] triggers which exacerbated Plaintiff's symptoms." *Id.*

During visits with Ms. Salada-Conroy on February 11, 2016 and March 2, 2016, Plaintiff stated she was doing better. Tr. 376, 379. However, at her March 2, 2016 visit, Plaintiff reported she was having severe panic attacks and had passed out, and she had a miscarriage causing more anxiety. Tr. 379. On examination, Plaintiff exhibited calm motor activity, moderate/severe distress. anxious mood and affect, and fair attention and concentration. Tr. 380.

On March 6, 2016, Plaintiff established mental health treatment with Michelle Atallah, LMSW ("Ms. Atallah"), at Brylin Behavioral Health System ("Brylin"). Tr. 672-78. Plaintiff indicated that she was dissatisfied with the therapy treatment she had been receiving at Suburban Psychiatric because "it wasn't helping her at all." Tr. 672. She stated that she started going to a psychiatrist after she was assaulted "a year ago in May." *Id*. Plaintiff reported sleep difficulties and passing out during stressful situations. *Id*. She stated that the last time she passed out "was triggered when [she] was listening to Lady Gaga singing about sexual harassment." *Id*. Plaintiff also reported she was "on leave [but] still in the process of looking for another job. *Id*. She had

been working at a youth center but stopped working there because the person who assaulted her was a member of the youth center. Tr. 678.

Thereafter, Plaintiff attended individual therapy sessions with Ms. Atallah (Tr. 640-78), until January 2017 when Plaintiff informed Ms. Atallah that she had "purchased a one-way ticket to California and would be gone for an unknown period of time (Tr. 640-41)." Plaintiff returned to treatment with Ms. Atallah on March 14, 2017.  Tr. 638-39. Plaintiff reported that, although she still had continued symptoms of PTSD, she was "doing a little bit better with socialization" and she wanted to return to school and get a part-time job. Tr. 638. She also reported she was now able to drive although she "occasionally ha[d] fainting spells." *Id*.

On April 12, 2016, Plaintiff presented for a follow-up visit with Ms. Salada-Conroy. Tr. 382-84. Plaintiff stated she was "having severe panic attacks" and "pass[ing] out," and she was going to Brylin for therapy. Tr. 382. Plaintiff continued to exhibit a calm but anxious presentation with moderate/severe distress. Tr. 383. Ms. Salada-Conroy noted similar clinical presentation at Plaintiff's April 27, 2016 and June 7, 2016 visits. Tr. 386, 389.

Plaintiff was admitted for psychiatric observation at Brylin Hospital from April 22, 2016 to April 25, 2016. Tr. 281-86. Plaintiff was brought in by her family due to concerns that she was "more argumentative and may be taking more of her meds than prescribed." Tr. 281. Plaintiff admitted that she may have been taking too much Ritalin which was making her "more hyper." *Id*. Plaintiff was noted to be "slightly anxious" and "possibly minimizing symptoms," but her mental status examination findings were otherwise unremarkable. Tr. 282. During her hospital stay, it "appeared [Plaintiff] was not sleeping [and] was increasingly labile." *Id*. Plaintiff's father did not believe she was abusing her meds but felt she was having difficulty coping with a recent abortion. *Id*. She was discharged home with instructions to follow-up with outpatient treatment at Suburban Psychiatric and Brylin. Tr. 282-83.

On July 15, 2016, Plaintiff was treated in the ED due to injuries related to a seizure. Tr. 330-39. She reported four seizures since February and had been prescribed Lamictal. Tr. 330. Plaintiff was assessed with a "probable tonic-clonic seizure based on the description by her mother." Tr. 334. Plaintiff's mother also reported that Plaintiff had been treated in the ED in February for what was "likely a syncopal episode." *Id*. It was noted that "[Plaintiff's] Xanax use had increased over the last week due to increased anxiety. She ran out of Xanax approximate[ly] 5 days ago.  It is possible that she had a benzodiazepine withdrawal seizure today." *Id*. Plaintiff was prescribed a 5-day supply of Xanax and discharged with instructions to follow-up with neurology. *Id*.

On June 28, 2016, Plaintiff reported to Ms. Salada-Conroy that she "had another passing out episode, witnessed by [her] mother." Tr. 391. She also reported moving to a friend's house then moving out again, because she did not want to go home after being admitted to the hospital by her parents. *Id*. On psychiatric examination, Plaintiff appeared to be in moderate/severe distress with anxious mood and affect, but her examination findings were otherwise normal. Tr. 392. Plaintiff continued to exhibit similar clinical presentation at her July 19, 2016 visit with Ms. Salada-Conroy. Tr. 395.

On September 22, 2016, Plaintiff complained of anxiety and "OCD" symptoms and stated she had seen Dr. Hallett earlier in the month for a Prozac increase. Tr. 403. Ms. Salada-Conroy noted similar clinical findings to previous visits.  Tr. 404. There was no change on October 18, 2016. Tr. 407-08. On April 13, 2017, Plaintiff complained that Xanax was not working like she wanted, and her "mom want[ed] her to have a booster for Prozac. Tr. 414. Clinical findings were unchanged. Tr. 415-16.

Plaintiff had a therapy session with Ms. Atallah on June 12, 2017, during which Plaintiff reported that she continued to lose memory and have "mini blackouts," which Plaintiff "described

as sixty seconds or less of losing time." Tr. 626. Ms. Atallah started Plaintiff on Multidimensional Inventory Dissociation ("MID") therapy. *Id*. Plaintiff's mental status findings were essentially normal. *Id*.

Plaintiff attended follow-up visits with Ms. Salada-Conroy on June 14, 2017, October 5, 2017, December 19, 2017, and June 5, 2018.   Tr. 418-19, 430-31, 438-39, 446-47. Plaintiff reported she was still having seizures. *See* Tr. 418, 430, 438, 446. On psychiatric examination during these visits, Plaintiff appeared in moderate/severe distress with calm motor activity and anxious mood and otherwise normal mental status findings. *See* Tr. 419, 431, 439, 447.

Plaintiff also continued therapy with Ms. Atallah during this time with visits on September 18, 2017, December 19, 2017, April 12, 2018, and June 6, 2018. Tr. 614, 602, 580, 584. Ms. Atallah noted generally normal mental status findings. *See id*. On June 6, 2018, Plaintiff stated that she had passed out four times in the last month and was fearful of going back to school. Tr. 584.

On June 26, 2018, Plaintiff consulted with Judy Joy-Pardi, M.D.  ("Dr. Joy-Pardi"), at Suburban Cardiology, for "neurocardiogenic syncope, questionable seizure disorder, attention deficit disorder, depression, severe anxiety, and abnormal tilt table test." Tr. 456-58.  Dr. Joy-Pardi assessed "vasodepressive response and significant orthostasis in the office today" and noted that Plaintiff's seizure disorder was managed by neurology, and she was "obviously still having ongoing issues" with her psychiatric health. Tr. 456. Dr. Joy-Pardi noted that Plaintiff had "somewhat of a salt aversion" and was "already on a high dose of SSRI[s]."[2] *Id*. Dr. Joy-Pardi stated that she was "uncertain if [Plaintiff] had pseudoseizures or true seizures but [she] certainly has documented neurocardiogenic syncope with significantly abnormal tilt table test in January

---

[2] "SSRIs" or selective serotonin reuptake inhibitors are antidepressant medications used to treat depression, anxiety, panic disorder, and several other mental health conditions. Commonly prescribed SSRIs include Citalopram Celexa), Escitalopram (Lexapro); Fluoxetine (Prozac); Paroxetine (Paxil, Pexeva); and Sertraline (Zoloft). Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/depression/in-depth/ssris/art-20044825 (last visited Mar. 4, 2024).

2016." *Id*. She prescribed sodium chloride tablets and Midodrine twice a day and recommended an echocardiogram. *Id*.

On October 23, 2018, consultative examiner Susan Santarpia, Ph.D. ("Dr. Santarpia"), conducted a psychiatric evaluation. Tr. 682-86. Plaintiff reported experiencing excessive apprehension, worry and restlessness to the point of panic. Tr 682. She also endorsed some short-term memory deficits. *Id*. On mental status examination, Dr. Santarpia noted that Plaintiff was cooperative and well groomed, with normal motor behavior and appropriate eye contact. Tr. 684. Plaintiff was alert and oriented and had fluent speech, coherent and goal-directed thought processes, euthymic mood, intact memory and concentration, and fair insight and judgment. *Id*. Dr. Santarpia opined that Plaintiff was able to: understand, remember, and apply simple as well as complex directions and instructions; use reason and judgment to make work-related decisions; interact adequately with supervisors, co-workers, and the public; sustain concentration and perform a task at a consistent pace; and sustain an ordinary routine and regular attendance at work, maintain personal hygiene and appropriate attire, and be aware of normal hazards and take appropriate precautions within normal limits. Tr. 685. She further opined that Plaintiff would have mild impairment in regulating emotions, controlling behavior and maintaining well-being with difficulties being caused by "stressors." *Id*.

On November 15, 2018, Plaintiff reported to Ms.Salada-Conroy that she had a seizure after two years of stability with medication. Tr. 739. She was anxious and in moderate distress, but her clinical presentation was otherwise unremarkable. Tr. 741. Plaintiff exhibited similar presentation on December 11, 2018. Tr. 744. On January 15, 2019, Plaintiff complained of poor short-term memory and a concussion six weeks ago due to a seizure. Tr. 748. She displayed anxiety and appeared to be in moderate distress. Tr. 749. At Plaintiff's March 21, 2019 visit, she complained

she could not sleep. Tr. 756. She continued to display anxiety and moderate distress but otherwise generally normal psychiatric findings. Tr. 757.

On April 8, 2019, Plaintiff was voluntarily discharged from mental health treatment at Brylin. Tr. 697. She reported reduced symptoms of trauma, and she did not want to continue with EMDR[3] therapy. Plaintiff reported that she continued to feel down and had some good and bad days, but she "need[ed] to get back in the norm of life" and was" transitioning back." Tr. 696. Ms. Atallah noted that "further treatment at this level [was] to be unlikely to yield added clinical gains." *Id*.

Plaintiff had a follow-up visit with Dr. Joy-Pardi on July 3, 2019. Tr. 718. Dr. Joy-Pardu indicated that a "rate drop response pacemaker may or may not benefit Plaintiff." However, "[Plaintiff's] insurance would not approve this without demonstrating bradycardia as a significant component." *Id*. Dr. Joy-Pardu noted that Plaintiff had worn a prolonged monitor during which showed "symptoms of presyncope but no frank syncope" and "no brady or tachyarrythmias." *Id*. Dr. Joy-Pardu also noted that Plaintiff was on "maximal dose therapy given Midodrine, sodium tablets, SSRI[s], etc." *Id*. She also noted that Plaintiff was s drinking occasionally which could make her symptoms worse. *Id*.

On July 22, 2019, Plaintiff had a follow-up visit for her loop recorder device, which had been implanted On July 16, 2019. Tr. 727-32. She had no acute complaints and denied shortness of breath, chest pain, palpitations, syncope, anxiety, or any other symptoms. Tr. 727.

On September 3, 2019, Plaintiff had a follow-up visit with Alanna Casataldo RPA-C ("Ms. Casataldo") at DENT Neurologic Institute. Tr. 773-75. Plaintiff reported she was doing worse in

---

[3] Eye movement desensitization and reprocessing ("EMDR") therapy is a structured therapy that encourages the patient to briefly focus on the trauma memory while simultaneously experiencing bilateral stimulation (typically eye movements), which is associated with a reduction in the vividness and emotion associated with the trauma memories. American Psychological Association ("APA") website, https://www.apa.org/ptsd-guideline/treatments/eye-movement-reprocessing (last visited Feb. 29, 2024).

comparison to her previous visit and had increasing passing out spells over the past few weeks. Tr. 773. Plaintiff also reported balance problems and vision difficulty, as well as difficulty maintaining sleep at night despite taking two sleep aids. *Id.* Ms. Casataldo noted that some "underlying mood disorder [was] also driving these spells." *Id.* Physical examination findings were unremarkable. Tr. 774. Ms. Casataldo "increased Lamicatal to 200 mg 1 tablet in the morning and 1-1/2 tablets at night" and ordered a 24-hour ambulatory EEG. Tr. 774-75.

On October 15, 2019, Plaintiff reported two seizure-like episodes since her last visit with Ms. Casataldo. Tr. 769. Ms. Casataldo noted that Plaintiff's Lamictal level was low, and her EEG was "completely normal." Tr. 771. She increased Lamictal and recommended increasing Seroquel to optimize sleep; Plaintiff was to continue her current doses of psychiatric medications. *Id.*

On December 5, 2019, Ms. Salada-Conroy completed a Mental Impairment Questionnaire. Tr. 1011-1016. Ms. Salada-Conroy indicated that she had treated Plaintiff since March 18, 2015, and saw Plaintiff 4-5 times per year. Tr. 1011. Ms. Salada-Conroy opined that Plaintiff was seriously limited in her mental abilities to remember work-like procedures; understand, carry out simple instructions and make simple decisions; maintain attention for two hour segments, ask simple questions, accept instructions and respond appropriately to supervision; is unable to meet competitive standards regarding working with others and responding to changes in work setting; and had no useful ability to function regarding maintaining regular attendance, sustaining an ordinary routine without special supervision, completing a normal workday and workweek, performing at a consistent pace without an unreasonable number and length of rest periods, getting along with co-workers and dealing with normal work stress, is not persuasive. Tr. 1013. Ms. Salada-Conroy further opined that Plaintiff had serious limitations in understanding and remembering detailed instructions and traveling in unfamiliar places; is unable to meet competitive standards in carrying out detailed instructions, and interacting appropriately with the general

14

public, with no useful ability to function in setting realistic goads or making plans independently, dealing with stress of semiskilled and skilled work and maintaining socially appropriate behavior. Tr. 1014. She indicated that Plaintiff had marked restriction of activities of daily living; difficulties in maintaining social functioning, and in maintaining, concentrating, persisting or pace; had one or two episodes of decompensation within 12 months each of at least two weeks duration; that she would be unable to function at a job on a day to day basis, would be off task 25% or more of the work day, would have good days and bad days, and be absent more than four days per month. Tr. 1015.

As noted above, Plaintiff challenges the ALJ's RFC finding. A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

15

Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27, 2017). Here, Plaintiff filed her claims on July 10, 2018, and therefore, the 2017 regulations are applicable to her claim.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings.  The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and consistency.  *Id*.

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a

medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the Commissioner's authority. *Brown v. Yuckert*, 482 U.S. 137, 145 (1987) (citing *Heckler v. Campbell*, 461 U.S. at 466).

Here, the ALJ complied with the regulations, and contrary to Plaintiff's contention, the ALJ thoroughly considered the entire record, including the treatment records and the opinion

evidence, as well as Plaintiff's reported daily activities, to formulate an RFC that properly accounted for all of Plaintiff's credible limitations, as supported by the record.

Plaintiff's sole challenge to the ALJ's RFC finding is that the ALJ's assessment that Plaintiff would be off-task 5% of the workday was not supported by substantial evidence because he "failed to tether his off-task limitation to any clear and concise evidence." *See* ECF No. 5-1 at 13-25. According to Plaintiff, the ALJ based the 5% off-task limitation "seemingly on arbitrary middle ground" between Ms. Salada-Conroy's opinion that Plaintiff would be off task 25% of a day (Tr. 1016) and Dr. Santarpia's opinion that Plaintiff was able to sustain concentration and perform a task at a consistent pace (Tr. 685). *See* ECF No. 5-1 at 15. Contrary to Plaintiff's argument, however, Dr. Santarpia's opinion, as well as other evidence in the record, supports the ALJ's finding that Plaintiff had no more than moderate limitations in the ability to concentrate, persist and maintain pace. Furthermore, Dr. Santarpia's assessment on its face (Tr. 685) directly refutes Plaintiff's argument that "Dr. Santarpia's opinion provided no assessment of concentration issues or time off task."

The ALJ found Dr. Santarpia's assessment "partially persuasive," noting that, although Dr. Santarpia was "an acceptable medical source with program knowledge, a medical specialty in psychology who personally examined the claimant within the relevant period," her assessment "was based upon one examination, and proffered early in the pendency of the claim, prior to the subsequently developed evidence . . . suggesting that the claimant developed greater limitations in concentrating, persisting and maintaining pace and adapting and managing herself, consistent with moderate limitations as delineated in the [RFC]." Tr. 25.

The ALJ also considered the findings of state agency psychological consultant J. Shapiro, Ph.D. ("Dr. Shapiro") (Tr. 87-88). Tr. 26. As the ALJ noted, Dr. Shapiro reviewed the record on November 20, 2018, and found that Plaintiff's mental impairments were non-severe. Tr. 26, 88.

The ALJ found Dr. Shapiro's assessment "partially persuasive" because it was "rendered by an acceptable medical source with program knowledge and fully familiar with the Social Security policies and regulations regarding disability" and "despite the lack of treatment or examining history, the opinion is generally consistent with the medical evidence of record, which reflect grossly normal mental status findings . . . ." *Id*. However, the ALJ explained that "while the record as a whole does not support the allegations to the degree the claimant purports, it does show she continues to have limitations regarding her concentration and adaption, which warrant greater restrictions than opined [by Dr. Shapiro], consistent with moderate limitations." Tr. 26.

Turning to Ms. Salada-Conroy's December 5, 2019 opinion that Plaintiff was, *inter alia*, "seriously limited" or had "marked" limitations in her mental abilities, including being off-task 25% (or more) of the workday (Tr. 1011-16), the ALJ reasonably found it "not persuasive." Tr. 26. The ALJ explained that he found Ms. Salada-Conroy's assessment inconsistent with the opinions of Drs. Santarpia and Shapiro, as well as inconsistent with the mental status examinations from Brylin, Horizons, and Suburban Psychiatric showing grossly normal psychiatric findings. Tr. 26. Therefore, the ALJ reasonably found the marked limitations opined by Ms. Salada-Conroy unsupported by the record. Tr. 26. *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920 (c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be");  *see also Woodmancy v. Colvin*, 577 F. App'x 72, 75 (2d Cir. 2014) (summary order) (record evidence of unremarkable clinical findings contradicted or failed to support the limitations and conclusions in these opinions).

The ALJ also properly considered Plaintiff's wide range of daily activities of daily. Tr. 26. *See* 20 C.F.R. § 404.1529(c)(3)(i) (An ALJ may consider the nature of a claimant's daily activities in evaluating the consistency of allegations of disability with the record as a whole.); *see also*

*Ewing v. Comm'r of Soc. Sec.*, No. 17-CV-68S, 2018 WL 6060484, at *5 (W.D.N.Y. Nov. 20, 2018) ("Indeed, the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms.") (citing 20 C.F.R. § 416.929(c)(3)(i)). In this case, the ALJ reasonably concluded that Ms. Salada-Conroy's assessment was "not consistent with [Plaintiff's] own testimony regarding her wide-range of activities of daily living, including travel, taking vacations and playing volleyball." Tr. 26, 58, 61. Plaintiff also reported going to the library, watching TV, listening to music, going out with friends, and being on social media. Tr. 685.

Thus, Dr. Santarpia's examination results and assessment, as well as Plaintiff's mental status examinations showing grossly normal psychiatric findings, and Plaintiff's level of activities, failed to support Ms. Salada-Conroy's assessment that Plaintiff would be off task 25% of the workday. Rather, the record reasonably supported the ALJ's assessment of a 5% off-task time limitation. *See Monguer v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (finding that a consultative examiner's opinion may constitute substantial evidence in support of an ALJ decision, even overriding treating source evidence).

Furthermore, the RFC does not need to exactly correspond to a particular medical opinion. *Schillo v. Kijakazi*, 31 F.4th 64, 77-78 (2d Cir. Apr. 6, 2022) (affirming where the ALJ declined to adopt the limitations set forth in three treating source opinions, and the RFC finding did not match any opinion in the record). Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record as a whole. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56). Thus, the ALJ was not required to craft an RFC that mirrored a medical opinion and was not bound to adopt the entirety of any opinion. *See Schillo*, 31 F.4th at 78; *see also Johnson v. Colvin*, 669 F. App'x 44, 47 (2d Cir. 2016) "[t]he fact that the ALJ assigned a particular percentage range . . . to illustrate [Plaintiff's] limitation

does not undermine the fact that the ALJ's finding was supported by substantial evidence;" *Kirkland v. Colvin*, No. 15-cv-6002P, 2016 WL 850909, at *12 (W.D.N.Y. Mar. 4, 2016) (finding that the ALJ did not err by assessing specific limitations that did not precisely correspond to any medical opinion because the claimant's daily activities, treatment history, and consultative examiner's opinion supported the limitations).

Additionally, the present case is distinguishable from *Cosnyka v. Colvin*, which Plaintiff cites for the proposition that the ALJ's off-task time was improper because it was based on the "ALJ's own surmise" rather than evidence in the record. *See* ECF No. 5-1 at 15-20 (citing "*Cosnyka v. Colvin*, 576 Fed. App'x 43, 46 (2d Cir. 2014).   In *Cosnyka*, the court found that nothing in the record supported the ALJ's off-task time limitation and indeed some evidence was "to the contrary." *Cosnyka*, 576 Fed. App'x at 46. Here, the ALJ noted Dr. Santarpia's finding that Plaintiff was able to sustain concentration and perform a task at a consistent pace (Tr. 685), but he also specifically noted later evidence suggesting that Plaintiff developed greater limitations "consistent with moderate limitations as delineated in the [RFC]." Tr. 25.

Similarly, with respect to Dr. Shapiro's opinion (Tr. 88), the ALJ found that, while the record as a whole did not support Plaintiff's allegations to the degree purported, the evidence did show that Plaintiff continued to have limitations relating to concentration and adaption, which warranted greater restrictions than opined by Dr. Shapiro and consistent with the moderate limitations outlined in the RFC. Tr. 26. Furthermore, as discussed above, the ALJ explained that Plaintiff's normal mental status examinations and her level of activities failed to support Ms. Salada-Conroy's assessment that Plaintiff would be off task 25% of the workday. *Id*. Thus, the ALJ reasonably explained how he considered the opinion evidence and the other record evidence when formulating the 5% off-task time limitation, and substantial evidence supports the ALJ's

finding. *See Johnson*, 669 F. App'x at 47 (highly specific RFC findings are not problematic when supported by substantial evidence in the record).

As previously noted, Plaintiff bears the ultimate burden of proving that she was more limited than the ALJ found. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *Poupore*, 566 F.3d at 306 (it remains at all times the claimant's burden to demonstrate functional limitations, and never the ALJ's burden to disprove them).

Based on the foregoing, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## **CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 5) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 6) is **GRANTED**. Plaintiff's

Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE